1    UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF FLORIDA
2        WEST PALM BEACH DIVISION

3

4                           CASE NO. 24-22288-EPK

5

6  IN RE:

7   MISS AMERICA COMPETITION, LLC,

8            Debtor.
_____/

9

10

11

12

13        EMERGENCY MOTION TO DISMISS CHAPTER 11
      BANKRUPTCY AND FOR EMERGENCY INJUNCTIVE RELIEF (9)

14

15              November 27, 2024

16            The above-entitled cause came on for hearing

17  before the Honorable ERIK P. KIMBALL, Chief Judge of the

18  UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN

19  DISTRICT OF FLORIDA, at 1515 North Flagler Drive, West

20  Palm Beach, Palm Beach County, Florida, on November 27,

21  2024, commencing at or about 2:30 p.m., and the following

22  proceedings were had:

23        Transcribed from a Digital Recording By:
          Anna M. Meagher, Shorthand Reporter

24

25

1                    APPEARANCES:
2

          Kelley, Fulton, Kaplan and Eller, by
3                C. Craig Eller, Esquire
                    Dana Kaplan, Esquire
4        On behalf of Miss America Competition, LLC.
               Email:  Celler@kelleylawoffice.com
5            Email:  Dana@kelleylawoffice.com
6

                  Carlton Fields, P.A., by
7                David L. Gay, Esquire
              Ilan A. Nieuchowicz, Esquire
8            On behalf of Robin Flemming
               Email:  Dgay@carltonfields.com
9        Email:  Inieuchowicz@carltonfields.com
10

                VIA ZOOM VIDEO CONFERENCE:
11

12              Carlton Fields,  P.A., by
              Justin L. Chretien, Esquire
13                Gene Rossi, Esquire
              On behalf of Robin Flemming
14        Email:  Jchretien@carltonfields.com
               Email:  Grossi@carltonfields.com
15

16              Zink Zink Zink Co LPA, by
                 Larry A. Zink, Esquire
17              State court counsel for
              Miss America Competition, LLC
18            Email:  Zinklaw3711@yahoo.com
19

                Office of the US Trustee, by
20            John S. Schank, Attorney/Advisor
              Email:  John.s.schank@usdoj.gov
21

22                - - - - - - -
23
24
25

```
1                    THE CLERK:  All rise.  This Honorable Court
2     is back in session.  Chief Judge Kimball presiding.
3                    THE COURT:  Thank you, everyone.  Good
4     afternoon.
5                    (In Unison:  Good afternoon, Judge.)
6                    THE COURT:  Great.  Please have a seat.
7                    Ms. Leonard, I think I can take the
8     appearances in court.
9                    THE CLERK:  Okay.
10                   THE COURT:  Why don't we start with debtor's
11    counsel, Mr. Eller.
12                   Oh, we should call the case first.
13                   Ms. Leonard, if you could.
14                   THE CLERK:  Miss America Competition, LLC,
15    Case No. 24-22288.
16                   THE COURT:  Thank you.
17                   Mr. Eller.
18                   MR. ELLER:  Good afternoon, your Honor.
19    Craig Eller and Dana Kaplan of Kelly Kaplan and Eller on
20    behalf of the debtor, Miss America Competition, LLC.
21                   THE COURT:  Thank you.
22                   Ms. Kaplan, good afternoon.
23                   MS. KAPLAN:  Thank you.  Good afternoon.
24                   THE COURT:  Mr. Gay.
25                   MR. GAY:  Good afternoon, your Honor.  David
```

Page 4

1    Gay, for the record, G-A-Y, with Carlton Fields on behalf
2    of Robin Flemming.  I'm joined in the courtroom by my
3    colleague, Ilan Nieuchowicz, and on Zoom, by my colleagues
4    who have been admitted pro hac vice, your Honor -- I
5    appreciate those orders -- Justin Chretien and Gene Rossi,
6    and I believe that our client, Robin Flemming, as I'm
7    looking at the screen, is also appearing on Zoom.
8                        THE COURT:  Very good.  Good afternoon,
9    everyone.
10                       UNIDENTIFIED SPEAKER:  Good afternoon, your
11   Honor.
12                       UNIDENTIFIED SPEAKER:  Thank you, Judge.
13                       UNIDENTIFIED SPEAKER:  Good afternoon, your
14   Honor.  Happy early Thanksgiving.
15                       THE COURT:  Yeah, don't remind everyone that
16   it's the afternoon before Thanksgiving.  I'm being chewed
17   out behind the scenes for even having a hearing this
18   afternoon.
19                       And, Ms. Leonard, if you could take other
20   appearances online that would be helpful.
21                       THE CLERK:  Okay.  We also have Mr. Zink.
22                       MR. ZINK:  Yes.  Good afternoon, your Honor.
23   Larry Zink, I am trial counsel for Miss America in the
24   circuit court case.
25                       THE CLERK:  And Mr. Schank.

Page 5

```
 1                    MR. SCHANK:  And good afternoon, your Honor.
 2   John Schank, S-C-H-A-N-K, for the United States trustee.
 3                    THE COURT:  Very good.
 4                    Anyone else online, Ms. Leonard?
 5                    THE CLERK:  That's it.
 6                    THE COURT:  No, all right.
 7                    Mr. Eller, I realize we're not here on your
 8   motion, but I would like to hear a little bit about the
 9   case, and how it's come to us, et cetera.  This is the
10   first hearing we've had.
11                    MR. ELLER:  Certainly, your Honor.
12                    The debtor in this case is an entity called
13   Miss America Competitions, LLC, and it does run the
14   competition that we're all historically used to seeing,
15   and the continuation of that competition is scheduled for
16   January 5th in 2025.
17                    Mr. Straub, who is in the courtroom, is the
18   100 percent owner of that particular entity.  He has been
19   involved in state court litigation with Ms. Flemming over
20   the past several months.  That litigation began in April
21   of this particular year.
22                    I should go back just a little bit further
23   and explain how --
24                    THE COURT:  Let me --
25                    MR. ELLER:  -- we've sort of --
```

```
1              THE COURT:  -- and I would like you to do
2    that.  But let me just let everybody know, I've read
3    everything in the docket and every attachment, so you're
4    free to refer to it as necessary.
5              MR. ELLER:  As I've come to expect, your
6    Honor.
7              This entity was created back on
8    December 28th of 2022, and it was created for the specific
9    purpose of purchasing the Miss America pageant or
10   competition, if you will, the IP, the various vestiges of
11   that organization from an entity called the Miss America
12   Organization, Inc. and an entity called MAOIP Holding
13   Company, LLC to Miss America Competition, LLC, the entity
14   owned by Mr. Straub, with the intention of taking that IP,
15   making it profitable, continuing the competition and doing
16   the other things that were necessary in order to make this
17   a success.
18             THE COURT:  May I interrupt?  I have a
19   question.  Prior to that transaction, the entity that ran
20   the competition and owned the intellectual property, there
21   was more than one entity.
22             Are there now more than one after the
23   transaction --
24             MR. ELLER:  Yes --
25             THE COURT:  -- is this the only --
```

1              MR. ELLER:  -- there is.

2              THE COURT:  There are.  So there's other

3    entities that are involved as well?

4              MR. ELLER:  This is the primary entity.

5    There's another entity called Miss America IP, LLC, which

6    is a --

7              THE COURT:  Still?

8              MR. ELLER:  Still.

9              -- which is a nondebtor at this time.  There

10   may -- it certainly continues to have an involvement.

11   There are certain items that were part of a Miss America

12   museum that was run by my client.  Apparently some of

13   those items have been moved.  That's an issue involved in

14   the case.  But that entity was created to preserve that IP

15   and take action, as you might expect, to make sure that

16   that IP was not infringed upon.

17             THE COURT:  And that entity is also a party

18   to the state court action --

19             MR. ELLER:  It is.

20             THE COURT:  -- but is not a debtor.

21             MR. ELLER:  It is.  It's not a debtor at

22   this time.  It may need to become a debtor.  That is an

23   analysis that we're continually working on at this time.

24   But as far as the continuation of the competition and

25   those matters, this is the entity.  This debtor entity is

1    the entity that's wholly involved in that and is before

2    the Court today.

3                    THE COURT:  Please.  I interrupted you.

4                    MR. ELLER:  Not a problem, Judge.

5                    So the debtor entity before this Court was

6    created on November -- or, excuse me, December 28th.  The

7    Miss America IP entity was also created on that same date.

8    And, then, as the Court is aware, on December 30th, the

9    purchase agreement, the Asset Purchase Agreement between

10   the original Miss America organization and the debtor

11   entity and the IP entity were executed.  And, importantly,

12   it was executed by Ms. Flemming as president of that

13   particular entity, not as a member, not as a director.

14   The Membership Interest Assignment agreement, which the

15   Court has also seen reference to, was also signed by

16   Ms. Flemming as a manager.  Again, not a member, not as a

17   director.

18                   The litigation precipitated, associated with

19   circumstances where Ms. Flemming was making

20   representations to third parties that she was the owner of

21   the debtor.  There was a dispute concerning the identity

22   of the proper owner of the debtor, and there was a

23   suspension letter that was sent out on March 15th

24   suspending Ms. Flemming's services with the debtor, which

25   eventually turned into a termination letter dated

1   April 15, 2024.

2              I'm mentioning these things, because these

3   all tie-up into a very important order that was entered by

4   Judge Curley in the 15th Judicial Circuit Court, where he

5   spent an extremely long period of time going through the

6   various pieces of evidence and entered a 19-page order

7   with very detailed findings relating to these issues.

8              THE COURT:  I've read it.

9              MR. ELLER:  The state court case was filed

10  on April 25th.  Right after that Ms. Flemming files an

11  amendment with the Florida secretary of state for the

12  first time asserting that she is a member of the entity,

13  which happens to be untrue.  And then there was a hearing,

14  and the injunction order was entered on the 22nd, which

15  the Court has seen.  There was a motion to compel

16  compliance with that order filed in state court on

17  November 14, 2024, and on November 22nd this Voluntary

18  Petition was filed.

19             The reason we're here, Judge, is that my

20  client took on $4.1 million of debt of the Miss America

21  Competition as part of the execution of the first Asset

22  Purchase Agreement -- I say the "first," there were other

23  perceived agreements.  This is the one that was final.

24  This is the one that was executed -- and is obligated to

25  pay those creditors, which he has been doing on an ongoing

1    basis, in which Judge Curley also found that he had been

2    paying those debts.  But they were coming to a head where

3    those debts are not being paid because we lack the

4    financial information and the cooperation of Ms. Flemming

5    in order to deal with those debts.

6                  We do not have at this time any operational

7    control of the debtor.  We don't have access to the bank

8    accounts, which we need as far as complying with our

9    debtor-in-possession obligations.  We do not have access

10   to the QuickBook files to know what is being spent.  We

11   have concerns that there are inappropriate payments being

12   made to attorneys to fight with us in this particular

13   circumstance, and we need to get to the bottom of what the

14   debtor's expenses are.

15                  But there is certainly a desire to complete

16   and go through with the competition.  It's our biggest

17   event all year.  To quote a North Carolina farmer, we're

18   not going to cut off our nose to spite our face.  We're

19   absolutely wanting to complete the competition.

20   Mr. Straub has committed to support it, both

21   financially -- he has specifically written to the

22   shareholders and said -- which I know that the Court has

23   read -- that there will be no impact involving this

24   bankruptcy as to the completion of --

25                  THE COURT:  I think you mean stakeholders,

1    not shareholders.

2              MR. ELLER:  I may have misspoke.  I intended

3    to specify the executive directors, that is who the press

4    release, I will call it, attached as Exhibit A to our

5    response, was sent to.  It's the executive directors of

6    the competition.

7              So our first position here, Judge, is there

8    is no emergency here today for us to all be here.  The

9    competition is not in danger.  It is going forward.  We

10   are committed to it going forward.  Mr. Straub has pledged

11   his personal finances to make sure it does go forward.

12   I'm a little bit alarmed, because I've heard that some of

13   the subcontractors, some of the folks that have been

14   intricately involved, may have been fired by Ms. Flemming.

15   We're going to get to the bottom of that and make sure

16   that those people are rehired, that they are compensated,

17   that everything goes forward.  But the show will go on.

18   We have absolutely every intent and have expressed so in

19   multiple venues that the competition is to be completed.

20   We're not going to interfere.  In fact, we were going to

21   do much better than not interfere.  We're going to

22   completely cooperate and make sure that it happens.  So we

23   don't believe there is any emergency.

24              I can get to the issue that the petition was

25   properly filed with proper --

```
1              THE COURT:  Well, let's hear --
2              MR. ELLER:  -- resolution --
3              THE COURT:  -- the motion, and then you
4    can --
5              MR. ELLER:  Yes, yes --
6              THE COURT:  -- respond.
7              MR. ELLER:  -- I wanted -- but that's our
8    background.  That's where we are.  And that's our
9    position, is that the competition is not in danger.
10   Everyone should take from this hearing today that the
11   competition will be completed, and it will go on, and
12   we're very much committed to that.
13             THE COURT:  Thank you.
14             Mr. Gay.
15             MR. GAY:  Your Honor, again, David Gay, for
16   the record, on behalf of Ms. Flemming.
17             First I would like to say thank you very
18   much for accommodating us on such short notice and
19   especially the day -- although I'm reticent to remind
20   folks -- before Thanksgiving.  Always nice to be here,
21   your Honor, albeit on maybe not the best of circumstances,
22   but, again, appreciate your time.
23             As I mentioned, I am joined in the courtroom
24   by my colleagues, one, Ilan Nieuchowicz, and by Zoom,
25   Mr. Rossi and Mr. Chretien from DC, who are imminently
```

1   more knowledgeable about the background regarding this

2   entire disagreement, if you will, than I am.

3               I will just -- and I would like to, if the

4   Court will allow, have Mr. Chretien, from our office in

5   DC, address what are probably the substantive arguments

6   underlying the motion.

7               I'll just note that even based on

8   Mr. Eller's presentation, which I appreciate, I think the

9   question, your Honor, is that while we have some concept

10  of why we were in the state court action, the question is

11  why are we here?  And even as Mr. Eller said, and the

12  response that the debtor's filed yesterday indicates,

13  apparently they don't believe that they are getting

14  sufficient production in the state court proceeding with

15  respect to a state court order.  With all due respect,

16  last time I checked, that's not your Honor's problem.

17              The other issue is, allegedly, that there's

18  this other $4 million in debt, but at the same time,

19  they've admitted that they don't really know how much debt

20  there is because they allegedly don't have access to these

21  documents.  So their assessment of the debt picture of the

22  debtor is extremely dated, is, according to the

23  information we have and our client, vastly incorrect, as

24  is the statement that the debtor, in fact, is not

25  effectively paying its debts as they become due.

1               So I say that as a predicate to, if the

2      actual mission here was to maintain the status quo, give

3      the world some level of comfort that this marquee event

4      was going to go off as planned, then we're scratching our

5      heads as to why we're here.  Thus the exigency, your

6      Honor.  And the last thing I'll say is, because while the

7      competition, I believe, is scheduled to culminate on

8      January 5th, it actually begins just after Christmas.  So

9      there really is an immediacy to a number of issues that

10     have been brought up as a result of this filing.

11              So with that, your Honor, I'm happy to

12     pause, take any questions you may have.  I know my

13     colleague wanted to present to the Court some of the

14     background and obviously respond some of what Mr. Eller

15     presented as well.

16              THE COURT:  Sure.  Thank you.

17              Mr. Rossi, I believe.

18              MR. ROSSI:  Your Honor, just for the record

19     it's Gene Rossi.  Happy Thanksgiving.  I turn it over to

20     Mr. Chretien.

21              MR. CHRETIEN:  Justin Chretien.  And Gene

22     and I are both shareholders with Carlton Fields.

23              Your Honor, this is a simple case.  Robin

24     Flemming owns Miss America.  Mr. Straub wants it, and if

25     he can't get it, he will destroy it and Mrs. Flemming in

1    the process.  He has said as much many, many times before,

2    as you will see when we file our supplemental proceeding.

3                    No one who is a true owner of Miss America

4    would file a bankruptcy petition a month before the annual

5    competition that generates most of the revenue for the

6    year, and the entity, which is the Miss America

7    Competition, doesn't own -- doesn't operate the pageant

8    itself and has no real assets of its own.  It has no bank

9    account.  It pays no taxes.  The other entities conduct

10   the operations, conduct the pageant.  So if an owner, if

11   the actual owner, wanted to put Miss America into

12   bankruptcy, they would have put one of the operating

13   entities into bankruptcy.  Not MAC, Miss America

14   Competition, which simple holds the personal property

15   assets, the memorabilia, the paintings, the photographs

16   and does not conduct any operations, has no income, and

17   has no real debt.  So an owner would know that.

18                    Most critically, I would direct the Court's

19   attention to the state court records with the Division of

20   Corporations, as that indicates a couple of things.  On

21   December 28th, Miss America Pageant, LLC was formed by

22   Ms. Flemming as the sole member and sole authorized

23   representative.  That entity, Miss America Pageant, and

24   remember that please, was -- the named changed.  She

25   changed the name, and that was -- the name change was

1    effective on January 12, 2023 to Miss America Competition,

2    singular.  So on December 28th, there was no Miss America

3    Competition, LLC in Florida state records.  You can check

4    that.

5              And it's important to note, because if you

6    look at the attachment B to the response, it includes a

7    copy of what purports to be an operating agreement for

8    Miss America Competitions, plural, LLC, effective

9    December 28, 2022.  It is fraudulent for many reasons, but

10   for two immediate ones.  There was no Miss America

11   Competitions or Miss America Competition, singular, in

12   existence on December 28, 2022.  That means the date on

13   there is fraudulent.  The other aspect of this that it

14   clear, they spelled it Miss America Competitions, "S."

15   It's curious that after January 12th, Sunbiz.org when they

16   published the notice of the name change, they had a

17   typographical error later corrected.  That typographical

18   error had an "S" at the end of Miss America Competition

19   following the name change.  Only -- and it's evidence that

20   somebody was looking at the website for the name of the

21   corporation after January 12, 2023.  Later Sunbiz.org

22   removed the "S," and so what you see now in Florida State

23   records is Miss America Competition, LLC, and you can see

24   the name change document that is down near one -- near --

25   that follows the formation document for Miss America

1    Pageant, LLC.

2                    This is a fraud on the Court.  This is

3    bankruptcy fraud.  It is a bad faith filing.  It's the --

4    the entirety of their case has been premised on a handful

5    of documents drafted by attorney Craig Galle at the behest

6    of Mr. Straub to create the fiction, the fiction, that

7    they own these entities.  They do not.

8                    The same thing applies if you look at

9    Florida state records for Miss America IP.  Now, that's

10   one of the operating entities.  Florida state records

11   clearly show Miss America IP, LLC was formed by Ms. Robin

12   Flemming on December 28, 2022.  There is nothing in

13   Florida state records that changes these facts that Miss

14   America, LLC -- I'm sorry, Miss America Competition and

15   Miss America IP are both owned solely by Robin Flemming.

16   She did not authorize any operating agreement.  She did

17   not draft any operating agreement.

18                   They sprung to life in March of 2024 when

19   she rejected his request to serve as a proxy in a lawsuit,

20   in our view, a bad faith lawsuit against a property owner

21   association that has nothing to do with this case.  When

22   she rejected him, he launched an all-out blitz that

23   includes this filing in April.  It includes several

24   letters on Miss America letterhead that he has no

25   authorization to use.  It includes numerous defamatory

1    remarks.  He scheduled and conducted Zoom calls, for

2    example, acting as if he owns Miss America.  The harm that

3    has been done by Mr. Straub and Mr. Galle is immeasurable,

4    and I'll just -- we're going to address that at some other

5    point.  But this is a bad faith filing, because its

6    premised on false documents.

7              The real reason we're here, and you can see

8    it, is that they are unhappy with the way things went

9    inthe state court.  Now they got a TRO.  They got a TRO.

10   It was based on two-hour depositions, and our counsel at

11   the time was confronted with a number of false documents

12   that took a while to figure out were false, because on

13   their face, they looked like they were real.  It was

14   telling during the TRO process that the documents that

15   were produced, the few documents -- and there's about 600

16   documents that were produced by Mr. Straub's side, and all

17   of them were irrelevant to the issues.  He would not

18   reproduce his emails.  He would not produce any

19   substantive documents about the operations of his company,

20   Palm Beach Polo.

21             All of those documents, every single one,

22   had been stripped of metadata.  We have an FBI expert who

23   upon information and belief will testify that the

24   stripping of metadata from a PDF or from a Word document

25   has to be done intentionally.  So they produce all these

1   documents that were stripped of metadata.  They produced a

2   handful of false documents, and then we found one

3   document, though, that was not produced by Mr. Galle and

4   Mr. Straub.  It was a Word version of a document in April

5   of 2024.  Now, Mr. Galle said that he had no -- his laptop

6   had been stolen in Ecuador in January, which would

7   conveniently prevent him from having a document with

8   metadata back in December of 2022.  Then why is it that in

9   April, we obtained a document, through a different

10  witness, RayNa Osley, who is assistant comptroller at Palm

11  Beach Polo, Straub's company, she produced a Word version

12  of the same purported documents you see as attachment B to

13  the response from Mr. Straub's side.  The metadata for

14  that document, and we will establish this with expert

15  testimony, shows that that document was created on

16  August 25, 2023.

17             As more reason to know that this is a fraud

18  of massive proportions, he's trying to steal Miss

19  America -- that's what is at risk here -- a hundred-and-

20  three-year-old iconic American institution and the hopes

21  of thousands of girls who are going to be with their

22  families in Florida next month, in four weeks.  There's no

23  reason for somebody, a true owner, to file a -- a petition

24  in bankruptcy for Miss America Competition, when you don't

25  own it, number one, when the document you have is

Page 20

```
 1    fraudulent, and even if you did own it, it's not the
 2    operating entity.  The true owner would know this.  This
 3    is a fraud of great magnitude.
 4                     It's not going to be resolved here today.
 5    We're looking for dismissal of the petition in bankruptcy.
 6    We set forth the arguments.  It's clear to us that he
 7    lacks corporate authority to file on behalf of Miss
 8    America Competition, LLC.  There also is no distress,
 9    financial distress, on MAC.  And by the way, there's no
10    financial distress on Miss America.  They don't owe
11    anywhere near 4.1 million because -- not because of
12    Straub, who had agreed in the beginning to be the
13    financier -- he was going to finance a 4.1 million
14    reserve.  He promised her he would.  He quickly reneged in
15    January of '23 and said he would do it on a piecemeal
16    basis.
17                     And he did pay -- he did pay, on behalf of
18    Palm Beach Polo, one debt, a Small Business Administration
19    loan of $525,000.  Ms. Flemming, on behalf of Miss America
20    Competition, Miss America IP, paid that back.  So he's not
21    out any money.  He paid one loan.  He's paying a few other
22    things.  There's a line of credit that he's extended with
23    no written agreement in place.  All of that was in 2023
24    when relations were good, and he was presumably going to
25    continue financing, but she'd have to pay him back each
```

1   time.  But things went sour in March of '24 when she

2   rejected his request to serve as his proxy plaintiff in a

3   lawsuit in Palm Beach Circuit Court against the property

4   owner's association, which litigation he's engaged in on

5   his own.

6                  So we ask for the Court to recognize the

7   exigent circumstances here.  We have a pageant to conduct

8   in four to five weeks time.  Thousands of people will be

9   flocking to Orlando.  We ask for a couple of things.

10                 First, on the issue of whether or not the

11  petition can be dismissed, we would offer that we can --

12  that your Honor can decide that on the papers.  We're

13  going to submit a supplemental response or a reply brief

14  in the next few days, and we would ask for a quick turn,

15  perhaps a quick decision, if we can do it on the papers.

16  If we have to have a hearing on it, we want to have the

17  hearing after the pageant, because Ms. Flemming, frankly,

18  has a lot to do right now, and we don't want this to be

19  the burden on her that bringing -- that the bringing of it

20  by Mr. Straub was intended to cause.  So if we can have

21  something within -- we can file our papers within three or

22  four days.  They've already filed their response brief.

23  We'd ask to file a reply, and for your Honor to rule on

24  the papers if possible.  If an evidentiary -- we don't

25  need an evidentiary hearing.  I think the records speak

Page 22

1    for themselves.  If we have to have a hearing, we would

2    ask that it's after the pageant sometime in January.

3                    We would ask -- and I think counsel already

4    mentioned it, they don't want to interfere.  On the one

5    hand, they come in here and talk about not wanting to

6    interfere with the running of the pageant; well, then why

7    did you throw chaos and confusion across the nation?  Why

8    are you on Zoom calls telling the directors that she's a

9    thief and has stolen the company?  This is defamation of a

10   great, great magnitude.

11                   So we want to be upfront with the Court and

12   we want to be transparent.  We are reserving the right and

13   we don't think it conflicts with the automatic stay of

14   this Court, which we will respect entirely, but we don't

15   think the automatic stay precludes us from pursuing legal

16   action against Mr. Straub.  The debtor entity is MAC --

17   first of all, it's not his, but we'll assume for the

18   purposes of this argument that it is his.  MAC is not a --

19   is not going to be a party in any proceeding we bring, and

20   we don't think that the shield of bankruptcy can be used

21   by him as a sword to stop us from suing him for what he

22   has done to Miss America and to Ms. Flemming.  So we

23   reserve the right to do that, and we just want to be

24   upfront with your Honor.  We don't want to -- we don't

25   want anybody saying we're sandbagging you, saying one

Page 23

1   thing and then turning around and doing another.  So we

2   intend to abide by your rulings.

3                   We would ask for a quick ruling on the

4   petition and maybe that ends it all.  If pending a

5   ruling -- if the ruling will take some time, then we ask

6   for the injunctive relief that we're allowed to proceed

7   with the pageant and do all the things necessary to make

8   that competition a wonderful event for the young ladies.

9                   We would also ask, if I may, that

10  Mr. Straub, because they are at odds with each other, not

11  attend the 2025 pageant in Orlando this year.  In our

12  papers we'll explain why.  But that's the extent of the

13  relief we seek.

14                  I'm happy to answer any questions.

15                  THE COURT:  Well, Mr. Chretien let me start

16  with your suggestion several times that the debtor in this

17  instance is not an operating entity --

18                  MR. CHRETIEN:  Right.

19                  THE COURT:  -- that's actually involved in

20  producing the competition.

21                  Can you explain that in a little more

22  detail, because it impacts, I believe, your request that

23  any evidentiary hearing happen after the competition?

24                  MR. CHRETIEN:  Your Honor, it's funny you

25  ask, because Mr. Straub offered the services of his

Page 24

1   attorney, Craig Galle, to draft the agreements by which
2   Ms. Flemming, relying on him as her attorney, when he was
3   actually his attorney, to draft the agreements.  He
4   drafted it in three different parts.  One was the Asset
5   Purchase Agreement, then there's a Member Interest
6   Assignment agreement, and then there's a bill of sale.
7   The bill of sale conveys the personal property assets of
8   the MAO, the original Miss America Organization to MAC --
9               THE COURT:  The debtor.
10              MR. CHRETIEN:  -- the IP -- the debtor, the
11   debtor here, although the putative debtor here, although
12   we deny --
13              THE COURT:  No, no, it's -- stop.
14              MR. CHRETIAN:  Yeah.
15              THE COURT:  This is not an involuntary.  It
16   is the debtor.
17              MR. CHRETIEN:  Right, right.
18              THE COURT:  The order for relief is
19   concurrent with the petition.
20              And go ahead.
21              MR. CHRETIEN:  So in the days after the
22   acquisition, through three documents, the Member Interest
23   Agreement assigned the IP assets of MAOIP Holding, it was
24   acquired by Miss America IP.  So Miss America IP, MAIP we
25   call it, owns, through the IP holding company, they own

1   all the intellectual property assets of Miss America.

2   MAC, for reasons that aren't really germane, never -- it

3   was like the stillborn child, it never became the --

4   the -- the company or the entity that was going to run the

5   competitions for reasons actually dealing with Mr. Galle

6   and delay in doing the name change, and there was a

7   problem with the EIN number, again, involving Mr. Galle.

8   So for whatever reason, for those reasons, she instead

9   turned to MAIP as the operating entity.  And there are

10  other entities, MASF, the scholarship foundation, and

11  MAOT, which is for outstanding teens.  Those three

12  entities, in particular MAIP, have the checking accounts.

13  They've got the assets, and they have more assets than

14  liabilities.  They are not financial distress.  This is

15  not -- this is not --

16            THE COURT:  Okay.  Now I'm focusing on --

17  let me back up.  I was asking about who the operating

18  entity is --

19            MR. CHRETIAN:  Yes.

20            THE COURT:  -- so there's an event which we

21  are all familiar with, which I've heard today is

22  commencing in December and ending in January.  I assume

23  that in order to move forward in that event, there would

24  be a number of contractual arrangements.

25            MR. CHRETIEN:  Yes.

1              THE COURT:  Who is the party to those

2     things?  Is it the debtor, or is it the IP entity?

3              MR. CHRETIEN:  IP entity.

4              THE COURT:  So Miss America Competition, LLC

5     is not a contracting party in moving forward with the

6     mechanisms necessary to actually have the competition?

7              MR. CHRETIEN:  Correct, your Honor.

8              THE COURT:  And so when you asked if there

9     needs to be an evidentiary hearing, you suggested that you

10    prefer it happen after the competition, and I assume that

11    is because your belief is that this Chapter 11 case has no

12    impact, really, on the operation of the competition

13    because the debtor is not involved in it.

14             MR. CHRETIEN:  I think that's a fair

15    statement, your Honor.  But there's a cloud of chaos and

16    confusion that generates most of the exigency here.

17             THE COURT:  I get it.  I get it.

18             Let me back up and let you all know that in

19    my view, anytime there's a question whether a bankruptcy

20    petition has been authorized, even for an individual,

21    that's a matter that the Court needs to address with some

22    expediency.  So whether you all think it's an emergency or

23    not is irrelevant, because I think it's an emergency when

24    there's a suggestion, in this case, that a Chapter 11

25    petition was signed by someone who is not authorized.  I'm

Page 27

1  not suggesting that you'll win on your motion to dismiss.

2  I'm suggesting that I need to address it soon.

3            And also in my experience, Mr. Chretien,

4  including in matters where there's a question with regard

5  to the authorization to sign a petition, it can almost

6  never be decided on the papers as you suggest, unless

7  there is a smoking gun, which I haven't heard of yet.  And

8  I haven't reviewed the filings with the Florida secretary

9  of state.  I'm sure you'd provide those.  But my

10  experience with filings relating to limited liability

11  companies is that they rarely shed useful light on who the

12  members are, because they don't have to.  And so I'm not

13  sure that's going to be very helpful, which means it seems

14  extremely likely I need an evidentiary hearing on the

15  issue, because I'm confident that Mr. Eller is going to

16  stand up and dispute anything that you said today.  So --

17  he's nodding yes.

18            So but your suggestion is, have it after the

19  competition, and that's helpful because you don't want the

20  distraction.

21            MR. CHRETIEN:  Yes, your Honor.

22            THE COURT:  Is there a need for any

23  discovery on related issues from your point of view?

24            MR. CHRETIEN:  Yes, your Honor.

25            THE COURT:  Yes.

Page 28

```
1              MR. CHRETIEN:  The issue precisely of
2    ownership could be resolved with the smoking gun, as I
3    have suggested.  In the absence of --
4              THE COURT:  Hold -- let me --
5              MR. CHRETIEN:  -- (inaudible.)
6              THE COURT:  -- let me just make clear.  I'm
7    not saying there must be a smoking gun.  I'm saying that
8    in my experience to decide it without an evidentiary
9    hearing, which usual includes testimony, is -- would be
10   unusual in this circumstance without something that's
11   really obvious, that is not disputed as to authenticity,
12   et cetera, so that's --
13             MR. CHRETIEN:  Yes, your Honor.
14             THE COURT:  -- my point.  I'm not saying
15   there must always be a smoking gun.
16             But go ahead, Mr. Chretien.
17             MR. CHRETIEN:  Yes, any hearing should be
18   after the pageant, and we'll want to take depositions of
19   Mr. Straub and Mr. Galle, in particular, also Kathy
20   Fialco, the comptroller, and perhaps others.
21             And we do have a filing that we'll submit
22   shortly as a reply brief to the response that Mr. Straub's
23   attorney filed yesterday.
24             THE COURT:  Understood.
25             Factual issues or legal argument in that,
```

Page 29

1    Mr. Chretien?

2              MR. CHRETIEN:  There are factual issues.

3    There are -- there's not simply the operating agreement

4    from Miss America Competition that's fraudulent, but

5    they've actually used six different documents that, in our

6    view, are absolutely fraudulent, and the arguments as to

7    why they are fraudulent is set forth in our brief, in our

8    reply brief.

9              There are other fraudulent documents that

10   are not as key to ownership.  They are more key to the

11   defamation, which are the fraudulent use of Miss America

12   letterhead by Mr. Straub and telling more than a thousand

13   stakeholders across the country in three different Zoom

14   calls that he was the head and she's the one violating the

15   law.  I won't -- I could talk for an hour on defamation

16   and the fraud and the other violations of law, let me just

17   put it that way, that have taken place here.

18             So we want it resolved as quickly as

19   possible, but we're right before the pageant, and we can't

20   do it right before the pageant, because Ms. Flemming has

21   to perform at her best and make sure that the pageant goes

22   off flawlessly.

23             We would ask that Mr. Straub stay away from

24   the venue, let her do her thing.  We can revisit the

25   ownership issue after the --

```
1              THE COURT:  Well, Mr. Chretien, let me
2    interrupt you, because I'm a little confused.
3              If the Miss America Competition, LLC is not
4    the contracting party for the venue and is not involved in
5    arrangements in connection with the competition, and that
6    is entirely in the control of another entity over which
7    Ms. Flemming retains sole control, does that entity, that
8    other entity, not have complete control over who it may
9    exclude from its event?
10             MR. CHRETIEN:  They do.  Although I think
11   that might be difficult to enforce in a large venue, and
12   if the Court would indulge us, I might -- or if counsel
13   would represent that Mr. Straub is not going attend, I
14   think that might be helpful, because -- she's the top --
15   top --
16             UNIDENTIFIED SPEAKER:  (Inaudible.)
17             MR. CHRETIEN:  Yeah.  She's the CEO, and in
18   our view the owner, and is operating a huge, huge
19   competition involving thousands of people, lots of moving
20   parts.  He in -- last year, and you'll see this in our
21   briefing tomorrow or when we file it, probably in a few
22   days, that Mr. Straub, who is an admitted racist, he says
23   this and we have the proof of it --
24             THE COURT:  Okay.  Mr. Chretien, I would
25   like you to focus on things relative to this motion.
```

1                    MR. CHRETIEN:  I'm sorry.

2                    THE COURT:  So we're not going to get off

3    into other allegations.  Please be more focused.

4                    MR. CHRETIEN:  I'm sorry.  He beat up -- he

5    assaulted a talent judge --

6                    MR. ELLER:  This is so far beyond --

7                    THE COURT:  Thank you.

8                    MR. ELLER:  -- any relevance.

9                    THE COURT:  Thank you, Mr. Eller, I

10   appreciate that.

11                   Mr. Chretien, let's --

12                   MR. CHRETIEN:  Okay, that's fine.

13                   THE COURT:  What I'm trying to figure out

14   today is, I have what appears to be a factual dispute, and

15   I need to resolve that and how should that be resolved,

16   and I suggested to you -- I would appreciate your

17   additional brief, that's fine.  But in my experience that

18   is unlikely to resolve the matter.  And so I will probably

19   set an evidentiary hearing.  You've asked me not to do

20   that in the next few weeks, which by the way, is what I

21   would have done.

22                   And so now I'm trying to determine whether

23   failing to address the issue in a final way in the next

24   few weeks is detrimental to anyone, and I'll be asking

25   Mr. Eller the same thing.  That's what I'm focusing on,

1  because I'm a little concerned -- if the reality is the

2  competition can happen without any input from Miss America

3  Competition, LLC, then it's okay to have an evidentiary

4  hearing in middle of January, and --

5                    MR. CHRETIEN:  Your Honor --

6                    THE COURT:  Yes.

7                    MR. CHRETIEN:  -- I'm sorry.  I would ask

8  for your indulgence, Mr. Gay is in the courtroom there.

9  Our client is there, Ms. Flemming.  It would be her call

10  if she wanted to do an evidentiary hearing in December --

11                    THE COURT:  Okay.  But she should not be

12  addressing me directly.  You should be giving her advice.

13  So if you want to communicate with her independently,

14  that's fine.

15                    MR. CHRETIEN:  Okay.

16                    THE COURT:  Why don't you do that, and I'll

17  hear from.

18                    MR. CHRETIEN:  We'll go on mute, your Honor.

19                    THE COURT:  Yes.  Thank you.

20                    MR. CHRETIEN:  Thank you, Judge.  Thank you.

21                    THE COURT:  Of course.

22                    So, Mr. Eller, your views on how I should

23  address this procedurally, if you could?

24                    MR. ELLER:  I will do my best to remain on

25  the right track, your Honor.  We have various requirements

1  of the office -- from the office of the United States

2  trustee that we have to meet, disclosure requirements.  We

3  need to file our schedules.  We have various lengthy items

4  that need to be completed that we can't complete because

5  of Ms. Flemming's refusal to provide us access to that

6  information.  We can't even open a debtor-in-possession

7  account, because the secretary of state records have been

8  so misconstrue by her that she shows herself as the member

9  of the company when she's not.  And, therefore, we've got

10 an issue to complete what we need to do in order to stay

11 as a debtor-in-possession, which I'm sure our adversaries

12 prefer that we not.  So we're looking to resolve this much

13 quicker, rather than more lengthy periods of time.

14             We do understand from our client, for as

15 little information as we can get in the immediacy of this

16 hearing, that the Miss America entity is a contracting

17 entity for many matters.  There may be some subcontracts.

18 We don't know what all entities may have been created by

19 Ms. Flemming as subentities.  We're just getting -- you

20 know, starting to get this information following the entry

21 of the injunction by Judge Curley, so we don't have full

22 information.

23             But to delay the matter is going to prevent

24 us from complying with the things that we needed to do to

25 remain a debtor-in-possession.  So if there can be some

1    cooperation on that, we would an appreciate it.

2                        Again I want to stay --

3                        THE COURT:  I notice that your -- you

4    attempted to obtain that information through a Rule 2004

5    document request, yes.

6                        MR. ELLER:  We have served a subpoena, a

7    document request.  That was one of the very first things

8    that was done.  That is of record.  The notice of intent

9    is in the court file.  But the -- in state court they've

10   been trying to get that information for, you know, a

11   couple of weeks and have had no success.  So we may be

12   before this Court on what we would consider a real

13   emergency to get that information, so that we can comply

14   with the requirements of the U.S trustee.

15                        At the same time we may be requiring an

16   order of the court, which we'll file a proper motion, in

17   order to open the DIP bank accounts.  The funds of this

18   entity need to be under the supervision of the Bankruptcy

19   Court, not under Ms. Flemming's supervision.  I suspect

20   there will be a fight on that.  So that needs to take

21   place as quickly as possible, and it's in everybody's best

22   interest, including the creditors of this estate.  And,

23   again, there was an admission that there is a list of

24   $4.1 million worth of creditors in the purchase agreement,

25   and that's what we're here for, that's the reason this

Page 35

1    bankruptcy case was filed.  Those need to be dealt with

2    because they haven't been dealt with, and that's the

3    reason it's in the best interest of the creditors to

4    continue this case before the Bankruptcy Court.

5              There needs to be transparency.  I've heard

6    a lot here.  Again, I want to try to stay very much on

7    track.  There is no basis for any injunctive relief,

8    Judge.  Rule 7001(7) says that must be done via adversary

9    proceeding.  You know, the hair stood up on the back of my

10   neck a little bit when they said Mr. Straub can't attend

11   the event as if he's some type of domestic violence

12   perpetrator.  He's an American citizen.  He can attend any

13   event he wants to.  There's not been any evidence

14   presented before this Court to assert that he would do

15   anything other than enjoy himself like the other involved

16   persons on this.

17             So, again, there's a lot of smoke and

18   mirrors here, but let's get to the bottom of it.  You

19   know, they had the opportunity to present all this stuff

20   before Judge Curley.  If there were lost laptops in

21   Ecuador, if there were, you know, various false fraudulent

22   agreements that should have been brought before Judge

23   Curley.  And to my knowledge, they did, and Judge Curley

24   looked at this information.  The Court has read his order,

25   and he said, you know, that Ms. Flemming was never a

Page 36

1    member of the debtor.  She was a manager and officer,

2    which does not invest her as a member.  She was terminated

3    on April 15th, 2024 and has no authority to act on behalf

4    of the debtor.  That's what Judge Curley found.  They have

5    no corporate documents to support their position.  Judge

6    Curley found that.

7              We're dealing with a situation where we can

8    throw the word "fraud" around with reckless abandon, but

9    it doesn't mean anything if you can't back it up.  And

10   they couldn't back it up before Judge Curley.  We have

11   presented the documents, and we do assert that the

12   documents are demonstrative of this situation.  The

13   operating agreement lists Mr. Straub as the sole member,

14   the sole director --

15             THE COURT:  And how do you respond to the

16   suggestion that it was fabricated long after the date and

17   that fabrication is indicated by the fact that it uses a

18   name that the debtor did not have at the time of the date

19   on the document itself?

20             MR. ELLER:  There was an original entity

21   named Miss America Pageant.  And there was a name change

22   of that entity, and at the time of the name change, a new

23   operating agreement was executed.  Those issues were also

24   before Judge Curley, and Judge Curley found that

25   Mr. Straub was the proper member, proper manager.

1              THE COURT:  Well, I don't want to be too

2    blunt, but I don't really care what Judge Curley found,

3    because it's not a final order and it's not binding on

4    this Court in any regard.  So I intend to address the

5    matter anew here.

6              But let's go back to where we were.  I want

7    to find out from you, you want an evidentiary hearing now,

8    next week, two weeks from now, is that what you're saying?

9              MR. ELLER:  Judge, I think this needs to be

10   resolved sooner rather than later because of the

11   requirements --

12             THE COURT:  Why was the case filed only

13   weeks before the competition was to start, and what is

14   your view on the suggestion that Miss America Competition

15   is actually not the operating entity?

16             MR. ELLER:  Your Honor, this is the first

17   time this issue is being brought to my attention.  In a

18   very brief conference with my client, it is our

19   understanding that it is the operating entity, because we

20   don't have full disclosure of the various contracts that

21   Ms. Flemming may or may not have entered into, because

22   we've been frozen out of those conversations, there may be

23   subentities, but the -- the operating entity is involved

24   with the production agent.  They hired the production

25   agent.  They apparently can fire the production agent,

Page 38

1    which is really -- has recently been done.  So we need to

2    get into those particular issues, and we may need

3    discovery on our own end on those issues.  But it is our

4    belief, standing here today, that it is the operating

5    entity.  It has entered into important agreements, and

6    it -- and, you know, we've committed to continue to fund

7    this entity so that those agreements can continue and the

8    competition can be completed as initiated.

9                 THE COURT:  But you're unable to say today

10   that you know that this debtor entity is the one that is

11   actually -- that actually has the bank account, that pays

12   for and contracts with those who are doing the actual work

13   in the event to be held in Orlando, or not; you can't say

14   that?

15                MR. ELLER:  Well, I can -- I don't want to

16   mention too much about the state court order, because I've

17   been given instructions --

18                THE COURT:  Well, no, I'm just telling --

19                MR. ELLER:  -- on that, Judge, I understand,

20   but the state --

21                THE COURT:  -- all I'm saying --

22                MR. ELLER:  That's what the state court

23   found.  It said, "Yes, you turnover these bank accounts,

24   you turnover the QuickBooks."

25                THE COURT:  Okay.  Wait, wait, wait.  It

Page 39

```
 1   would not surprise me that this LLC has a bank account.
 2   That doesn't mean it's the bank account from which the
 3   competition is being managed.
 4                 Do you see what I'm saying?
 5                 MR. ELLER:  I see the --
 6                 THE COURT:  And all I said about the state
 7   court order is I'm not bound by it.  I'm not bound by any
 8   finding --
 9                 MR. ELLER:  I understand.  I'm looking at --
10                 THE COURT:  -- the injunction is no
11   longer --
12                 MR. ELLER:  -- the findings --
13                 THE COURT:  -- enforceable.
14                 MR. ELLER:  -- I agree the Court is not
15   bound, but there are important findings there after a
16   lengthy hearing that are instructive, we think.
17                 And what we see is an entity that is
18   intricately involved that we believe is the operating
19   entity.  If not, why are we here on an emergency.  Why is
20   Ms. Flemming asserting that we must dismiss this case
21   immediately or the pageant is not going take place if it
22   were not the operating entity.  You can't have it both
23   ways.
24                 THE COURT:  Well, I think that one of the
25   suggestions is that your client representative has been
```

Page 40

```
1    representing himself as the person who is acting on behalf
2    of whoever is putting on the competition that will start
3    in a few weeks, whether it be rightfully through Miss
4    America Competition or, at least apparent to those
5    involved, on behalf of whoever it is --
6                  MR. ELLER:  Right --
7                  THE COURT:  -- that's the operating entity.
8                  MR. ELLER:  -- and --
9                  THE COURT:  Right.  And that's a problem if
10   Miss America Competition, even if you are right, if Miss
11   America Competition is not the one that's actually in
12   charge of putting on the competition.
13                  MR. ELLER:  And we had the same problem.
14   That's why we sought the injunctive relief in state court.
15   We had the problem of Ms. Flemming representing herself,
16   that she was the owner of the operating entity when she
17   was not.  So it's -- it's an equal-handed issue.
18                  THE COURT:  All right.  So let me go back.
19                  Are you asking -- you just told me that you
20   would need some discovery.  The holidays are fast
21   approaching.
22                  MR. ELLER:  They are indeed.
23                  THE COURT:  Okay.  And you know how things
24   work, so the idea of having an evidentiary hearing in two
25   weeks, that's something that you would ask for, or not?
```

Page 41

```
 1                    MR. ELLER:  I would prefer to have a brief
 2    recess.  I also have a personal issue --
 3                    THE COURT:  My thought --
 4                    MR. ELLER:  -- myself, because --
 5                    THE COURT:  -- I'll definitely give you
 6    that.
 7                    MR. ELLER:  -- I'm involved in -- I'm out of
 8    the office the week of December 9th.  My wife is having
 9    major surgery --
10                    THE COURT:  Oh, I'm sorry to hear that.
11                    MR. ELLER:  -- so I can't -- I would not be
12    able to be involved at that point in time, but I would --
13    if we could take a brief recess, so I could discuss those
14    issues to make sure I'm not missing anything.
15                    THE COURT:  Understood.  But --
16                    UNIDENTIFIED SPEAKER:  Your Honor, can I --
17                    THE COURT:  Hold on.  Let's make sure we're
18    all talking about the same thing.
19                    We have a motion to dismiss.  It is based, I
20    think primarily or singularly on lack of authority.  The
21    authority is an issue of fact.  It is appears to be in
22    dispute.  There's been a suggestion on the movant's side
23    that I could rule based on the papers.  That seems very
24    unlikely to me.  Now, I haven't seen what is about to be
25    filed, and I would like to address that before we leave
```

Page 42

1    today, but it seems to me I need an evidentiary hearing.

2              And so I'm going to want it hear from each

3    of you a restatement of your positions of when that would

4    happen, how much time would be necessary, meaning court

5    time, and what you need in the interim.  And I think, on

6    the debtor's side, Mr. Eller's side, you're going to be

7    asking for me to do something sooner, and I've already

8    heard from Mr. Chretien saying he wants it after the end

9    of the competition in January.

10             Now, who was speaking up that I interrupted?

11             MR. ROSSI:  Oh, your Honor, Gene Rossi.  I

12   just want -- I spoke with Ms. Flemming.  She would very

13   much like it after the pageant, because in the next few

14   weeks, she'll be working 24/7, 24/7 almost, trying to

15   organize this pageant, which is, as the Court knows, is

16   very popular around the world.

17             THE COURT:  Now, Mr. Rossi, I believe, then,

18   it's your view that in doing so Ms. Flemming would not be

19   acting in the name of Miss America Competition, LLC in any

20   regard?

21             MR. CHRETIEN:  Correct.

22             MR. ROSSI:  Correct, yes.

23             MR. CHRETIEN:  Miss America, absolutely,

24   your Honor.  Absolutely.  Other than if there's an issue

25   with transporting memorabilia, for example, to the venue,

1    that may or may not happen.  I can imagine that happening,

2    in which case -- and those would be assets, pictures and

3    such, I don't know, coffee mugs or whatever, those would

4    be technically assets of MAC.  But the pageant is run

5    through MAIP and to a lesser extent MASF, and not MAC.

6    MAC does not have a checking account, does not spend

7    money, does not earn money, and has no tax liability

8    because of that.

9              THE COURT:  Interesting.  So you're fighting

10   over something that is only -- whose interest is only in a

11   limited amount of personal property?

12             MR. CHRETIEN:  Yes, your Honor.  Exactly.

13             THE COURT:  So you would like to take a

14   break, and then we'll come back and talk about scheduling,

15   yes?

16             MR. ELLER:  Yes, please.

17             MR. CHRETIEN:  Yes.

18             THE COURT:  Is there anything I need to hear

19   about before I do that from anyone?

20             MR. CHRETIEN:  One other point I would make

21   is that Kathy Fialco is the controller -- comptroller at

22   Palm Beach Polo, Mr. Straub's company, she testified that

23   they don't have any corporate records for the Miss America

24   entities.  They don't have any records of compensation

25   paid to Ms. Flemming.  If what they said was true, that

Page 44

1    Ms. Flemming was a manager, then they would have payment

2    records of her as a manager --

3                    THE COURT:  Okay, we're getting --

4                    MR. CHRETIEN:  -- she draws.

5                    THE COURT:  -- Mr. Chretien, we're getting

6    into the evidence, I mean, I -- okay?

7                    MR. CHRETIEN:  Okay.  That's fine.

8                    THE COURT:  Yeah.  I promise I'll give you a

9    chance.

10                   Anything else?

11                   How much time do you need?

12                   MR. ELLER:  Five minutes.

13                   MR. CHRETIEN:  Five minutes is fine.

14                   THE COURT:  Okay.  No lawyers can ever do

15   anything in five minutes.

16                   MR. ELLER:  Yes, they can, Judge.

17                   You're right, you're absolutely right.

18                   THE COURT:  I'll give you 15 minutes.

19                   Thank you.  Court is in recess.

20                   MR. CHRETIAN:  Thank you, Judge.

21                   MR. ELLER:  Thank you, Judge.

22                   MR. ROSSI:  Thank you, your Honor.

23                   (A 14-minute was taken.)

24                   THE COURT:  Ms. Leonard, you can --

25                   (Computer Voice Prompt:  Recording in

Page 45

1   progress.)

2              THE COURT:  Thank you.

3              It's been at least 15 minutes, yes?

4              Are you in Florida, Mr. Nieuchowicz?

5              MR. NIEUCHOWICZ:  Yes, I'm local, Judge  --

6              THE COURT:  Oh, cool --

7              MR. NIEUCHOWICZ:  -- West Palm Beach.

8              THE COURT:  -- oh, wow, really local.

9              MR. NIEUCHOWICZ:  Delray Beach is where I

10  live, but I am here in this office.

11             THE COURT:  Where's Mr. Gay's office?

12             MR. NIEUCHOWICZ:  Mr. Gay's office is in

13  Miami.  He's in our --

14             THE COURT:  That's what I thought.

15             MR. NIEUCHOWICZ:  We have a new office in

16  the Brightline station down there.

17             THE COURT:  Really?

18             MR. NIEUCHOWICZ:  Yeah, it's so convenient.

19  The views are great.

20             MR. GAY:  Well, he says it's "new," we've

21  been there for three years.

22             THE COURT:  That's new.  That's new for me.

23             All right.  We're back on the record,

24  everyone.

25             Do you need to wait for anybody?

1                    (No audible response.)

2                    THE COURT:  All right.  Very good.

3                    One of the questions -- and I see Mr. Rossi

4    and Mr. Chretien are also back.

5                    One of the questions I have, there was a --

6    there had been a request, various requests, and some

7    injunction requests, and I think a relatively new one

8    today, asking me to tell Mr. Straub he can't go to Orlando

9    for the event.

10                    Mr. Rossi or Mr. Chretien, and I don't know

11   which one of you suggested that, but if the event is not

12   the debtor's business, meaning the debtor is not involved

13   in putting on the event, even if this was an adversary,

14   how would I have power to tell somebody not to interfere

15   with an event which is not associated with the debtor?

16                    MR. CHRETIEN:  Withdraw.

17                    MR. GAY:  We withdraw the request, your

18   Honor.

19                    THE COURT:  Okay.  Thank you.

20                    Scheduling issues, let's start with the

21   movant, whoever.  Mr. Gay.

22                    MR. GAY:  Thank you, your Honor.  David Gay,

23   again for the record, G-A-Y, on behalf of Ms. Flemming.

24                    Your Honor, I think you pointed to all the

25   circumstances in this case that actually, unusually --

Page 47

1   because I understand the Court's comments about the
2   necessity for dealing with authorization in a Chapter 11
3   filing quickly, and that's the standard.  Absolutely,
4   understand.  This is, as your Honor knows, an unusual
5   case.  It's an unusual for a whole host of circumstances.
6   One is obviously that we have the competition coming up.
7   And so we very much think that in order to maintain the
8   status quo -- which by the way, they said in their
9   response they were doing -- necessitates having this
10  termination from an evidentiary standpoint made after the
11  competition is over and that the parties, with the
12  Court's, not only blessing, but instruction, basically
13  maintain the status quo during that time period.  That
14  will allow for an orderly presentation of the issues
15  before the Court, but as importantly will allow for the
16  orderly conduct of the competition through January 5th.
17              THE COURT:  Right.  Well, your client's
18  position is that the competition is not in any way
19  impacted legally by this bankruptcy case.  It might be
20  impacted in other ways.
21              MR. GAY:  Your Honor, with the caveat -- if
22  I may, yes, your Honor.  I think with the caveat and this
23  is, you know, a moving issue, but like Mr. Chretien said,
24  there may be some memorabilia that could ostensibly be
25  property of the debtor that would be moved to the

Page 48

1    competition and would typically be part of the

2    competition, but with that caveat, your Honor, exactly

3    what you said.

4                    THE COURT:  Okay.  And that is why you

5    think now -- I'm going to skip over what I was going to

6    say.

7                    So right now we have a Chapter 11 filing.

8    Mr. Eller has been representing the debtor here today.

9    They don't have access to certain information.  They can't

10   even open a DIP account at this point.

11                   Has there been any communication with you or

12   your colleagues with regard to how you might assist in

13   providing the information that's necessary for them to do

14   the things that they need to do to satisfy the

15   requirements of the United States trustee, for example, in

16   the interim?

17                   MR. GAY:  Your Honor, I think there's few

18   points there.  One is, obviously, this has been pending in

19   a state court proceeding for some time.  There were,

20   effectively, discovery orders entered -- and my colleagues

21   will correct me when I get specifics wrong, but sometime

22   ago, about who was supposed to give what to whom and under

23   what circumstances --

24                   THE COURT:  Okay --

25                   MR. GAY:  -- and pursuant to those rules --

1              THE COURT:  -- let me be clear, let me

2    clear.

3              MR. GAY:  Yes, sir.

4              THE COURT:  With regard to Miss America

5    Competition, LLC, those orders are now unenforceable.

6              MR. GAY:  Understood, your Honor.

7              THE COURT:  If the case is dismissed they're

8    enforceable.  With regard to the other entity, not a

9    debtor, then whatever.  But I have no control over that,

10   nor does it have any impact on this case as far as I can

11   tell.

12             So what I'm asking you is whether your

13   client is willing to assist in order to make sure that the

14   argument raised by Mr. Eller is not a problem, and that

15   is, he said they want a ruling soon, because without that

16   ruling, they have no access to data that they need in

17   order to do the things that a debtor-in-possession needs

18   to do once a case is filed.

19             MR. GAY:  Understood, your Honor.

20             And what I was mentioning before, pursuant

21   to the state court proceeding, was simply that there had

22   already been a production in that case of a bunch of

23   financial documents from our side to their side.  So we

24   don't know what they don't have that they would need, but

25   as far as opening a DIP account, your Honor, again, don't

Page 50

1    know how that do that if there's no assets in which to

2    deposit, but your Honor --

3                    THE COURT:  Miss America Competition, in

4    your client's view, has no bank account whatsoever?

5    Someone said that earlier today.

6                    UNIDENTIFIED SPEAKER:  Correct.

7                    MR. GAY:  I believe that to be the case,

8    your Honor.

9                    THE COURT:  Okay.  No bank account.

10                   MR. GAY:  But to address your Honor's

11   overall concern, we understand in a bankruptcy proceeding

12   there are things that a debtor needs to do.

13                   THE COURT:  Yes.

14                   MR. GAY:  Now, there are, as your Honor

15   knows, a number of ways to deal with those things, and

16   this is an unusual case, and if, in fact, all of those

17   things turn out to be unnecessary, because this was an

18   unauthorized filing to begin with, then one potential

19   avenue of dealing with that is to simply stay those

20   specific requirements for the time period that is

21   necessary to get through the competition and your Honor's

22   determination on the authorization issue.

23                   THE COURT:  Okay.  There's lot of things

24   that fall within the category of what you were just

25   describing, which you haven't enumerated, and it is up to

Page 51

1    the United States trustee to decide whether or not they

2    pursue remedies when things aren't done appropriately, as

3    you well know.

4            But for right now, for example, is there

5    insurance?  I mean, there's all kinds of things that are

6    requested.  You've seen the questionnaire.  It's quite

7    lengthy and detailed and appropriate in all regards.  But,

8    nonetheless, right now Mr. Eller and his colleagues are

9    unable to do anything.

10           So what I'm suggesting is if you want a

11   hearing after the competition, then you need to be

12   cooperating in the meantime.  Is that clear?

13           MR. GAY:  Understood, your Honor.

14           And my only hesitancy, and not simply just

15   having said before, we'll do whatever it takes, is, one,

16   there have been some comments about, you know, what had or

17   hadn't been produced and we don't need to get into details

18   today, but just to correct -- or at least from my client's

19   standpoint -- the record to say there have been a bunch of

20   financials produced already, but also to say, your Honor,

21   that absolutely, you know, it's in everybody best interest

22   that there's insurance.  Clearly we understand that.  I

23   just do not want to write a proverbial blank check.

24           THE COURT:  No, I'm not asking for that.

25           MR. GAY:  Right.

Page 52

1           THE COURT:  But I'm also not suggesting that

2   it's appropriate to treat it as a discovery request.  I

3   know it was probably served as a discovery request.  But

4   that isn't what I'm asking.

5           MR. GAY:  Understood.

6           THE COURT:  I'm asking for a different kind

7   of cooperation over and above, "here are copies of

8   documents."

9           MR. GAY:  Understood, your Honor.  So,

10  again, my only hesitancy was with respect to what's

11  necessary for them to do the things that we're talking

12  about before this Court.  Understood.

13          THE COURT:  Okay.  I get it.  I didn't ask

14  for a blank check or an outright promise.

15          All right.  Let's hear from Mr. Eller, I

16  suppose, with regard to --

17          MR. ELLER:  It may be a combination --

18          THE COURT:  -- timing.

19          MR. ELLER:  -- Judge, because Ms. Kaplan is

20  much more familiar with the requirements of the U.S.

21  trustee.

22          THE COURT:  Or Ms. Kaplan, I don't mean to

23  favor one of you.

24          Oh, Mr. Gay, Mr. Gay, one other question,

25  how much time, meaning court time, do you think would be

Page 53

1    necessary to address -- I think it's only the

2    authorization issue, ownership and authorization.

3                    MR. GAY:  Your Honor, I think and it would

4    be our hope that we could get that done in a day.

5                    THE COURT:  Thank you.

6                    MR. GAY:  It depends a little bit on,

7    obviously, what develops by way of whatever discovery

8    takes place, but that would be our anticipation.

9                    THE COURT:  Now, when you say a "day," you

10   mean both sides in a day?

11                   MR. GAY:  Correct.

12                   THE COURT:  Okay.  Thank you.

13                   Ms. Kaplan.

14                   MS. KAPLAN:  Well, my biggest concern with

15   the delay has already been enumerated, which is the U.S.

16   trustee obligations that we have as a debtor, closing

17   accounts, closing bank accounts, opening accounts.  I do

18   not believe that there are no bank accounts.  There are

19   bank accounts.  I have initial debtor interview documents

20   that usually turn into a ream of paper to get to the U.S.

21   trustee's office.  We have a 341 meeting scheduled.  I

22   have schedules to complete in 14 days.  I know I can get

23   one 14-day extension.  So these are all of the things that

24   concern me, because on the one hand, they want to delay

25   the hearing until after the competition, but on the other

Page 54

```
 1    hand if, I as the attorney, don't comply with these
 2    obligations, I have a motion to dismiss from the U.S.
 3    trustee, effectively giving Ms. Flemming the relief that
 4    she wants, because I can't comply with the Code.
 5                    THE COURT:  Remember who has control over
 6    the ruling.
 7                    MS. KAPLAN:  I understand, but this is where
 8    my mind is going --
 9                    THE COURT:  Right.
10                    MS. KAPLAN:  -- as we're talking about
11    scheduling.
12                    We would like to see a hearing -- a hearing
13    before the competition, because from my client's
14    perspective, in the state court it's always delay and
15    always asking for more time and more time, and this is
16    just simply asking for time that they've been dealing with
17    since April.
18                    THE COURT:  There's not -- I would assume
19    that Ms. Flemming would be a focus of such a hearing and
20    that any discovery would be something that she would need
21    to be personally involved in.
22                    And so do you -- other than her, who is
23    involved in the competition which is apparently not
24    something run by the debtor?  I'm trying to figure out --
25    the argument is that the distraction would be unreasonable
```

Page 55

1    in light of the fact that the event starts in a matter of

2    weeks and you would be probably having an evidentiary

3    hearing in a matter of weeks --

4                    MS. KAPLAN:  Right.

5                    THE COURT:  -- and so why is not reasonable

6    that that might be a problem for the person who is

7    apparently overseeing the competition?

8                    MS. KAPLAN:  My client feels this is just

9    simply another excuse for delay.  However, we also

10   recognize that we have intervening holidays, not just a

11   competition coming up, but intervening holidays.

12                   I understand in the state court what

13   happened was the depositions were limited from a time

14   standpoint, the number of depositions and the time.  So to

15   the extent that depositions are required, my client would

16   request that we simply limit the amount of time and the

17   number of depositions.  I understand that's what Judge

18   Curley did, so this doesn't go on and on, and that was my

19   client's request.

20                   But, you know, we will defer to the Court,

21   but the other concern that I have is to meet obligations

22   of the U.S trustee -- my obligations to the U.S trustee as

23   well.

24                   THE COURT:  Right, and I think that can be

25   dealt with in some other ways.

Page 56

1              MS. KAPLAN:  Yeah.

2              THE COURT:  So all right.

3              Anything else?

4              MS. KAPLAN:  Oh, and, you know, I did just

5    want to say, I'm not sure if -- you know, we did issue the

6    subpoena just really so we can start to get these

7    financial documents.  I have seen the documents that were

8    produced in the state court.  It's not everything I need.

9    It's some of what I need, but it's not everything.  So I

10   have looked at those items.

11             THE COURT:  I assume that in your prior

12   discovery, you've learned where the records were kept and

13   in what forms, yes?

14             MS. KAPLAN:  I don't believe so.  I'd have

15   to refer --

16             THE COURT:  Never.

17             MS. KAPLAN:  -- to Mr. Zink on that issue.

18             THE COURT:  Mr. Eller.

19             MR. ELLER:  I'm not trying to --

20             MS. KAPLAN:  No, that's fine.

21             MR. ELLER:  -- I'm not trying to double team

22   at all, your Honor, but --

23             THE COURT:  Well, it's not trial, so that's

24   fine.

25             MR. ELLER:  Thank you.

Page 57

```
 1                    THE COURT:  And I think they had four -- no,
 2      three lawyers talk, so --
 3                    MR. ELLER:  That -- I'm glad you reminded
 4      me, Judge, I feel better now.
 5                    THE COURT:  (Laughter).  Go ahead.
 6                    MR. ELLER:  But in reviewing the documents
 7      intricately as I had to do today, I did notice there was
 8      reference to QuickBooks files and to have user ID's and
 9      passwords to access that.  And in my experience, that
10      pretty much is the, you know, hallmark of everything else.
11      That's where the bank accounts are going to be.  That's
12      where the financials are going to be.  That is something
13      that is -- you know, that belongs to the debtor, and if we
14      could in very short order -- I mean, even in one or
15      two days have the QuickBooks files and the user ID and
16      password to that, I think that would speed the process
17      along quite quickly.
18                    THE COURT:  All right.  I'm not addressing
19      that today.
20                    MR. ELLER:  Very good, Judge.
21                    MS. KAPLAN:  Understood.
22                    THE COURT:  I think it would be wise if you
23      get together with Mr. Gay --
24                    MS. KAPLAN:  Mm-hmm.
25                    THE COURT:  -- both of you or one of you and
```

Page 58

1    talk about those issues, because what I don't want this to

2    become is a rush to a hearing where you all ask me to

3    delay anyway because you haven't finished discovery.  And

4    I would prefer that you try to focus your discovery,

5    because the issues really are aimed at authority, which is

6    a very short history to this entity.  I've looked at

7    everything that I have in docket so far.  I do understand

8    there will be a reply, and I want to get to that.  But it

9    seems to me that the documentation is not going to be

10   enormous, unless there's something magical that you will

11   discover in discovery.

12              One would think that financial records,

13   history of contracting, and the like, since -- because

14   there was a competition last year, correct --

15              MS. KAPLAN:  Mm-hmm.

16              THE COURT:  -- put on, one would assume, by

17   the same entities?  This was after the acquisition.

18              Was there any evidence of that offered in

19   support of either side at the hearing in the state court?

20              (No audible response.)

21              THE COURT:  No.

22              MS. KAPLAN:  I would have to defer to

23   Mr. Zink.  He was state court counsel.

24              THE COURT:  Well, whatever.  I definitely

25   don't want people to say say here's the evidence we

1    presented elsewhere, because it will be a new hearing.

2                    MS. KAPLAN:  Mm-hmm.

3                    THE COURT:  Do you agree that a single day

4    is sufficient?  I think that's optimistic.

5                    MR. CHRETIEN:  Your Honor, if I may --

6                    THE COURT:  Yeah.

7                    MR. CHRETIEN:  -- amend our previous quote

8    to two days, I think it would probably be more ample to

9    address all the issues.

10                   THE COURT:  All right.  And when you said

11   "after" the competition -- it ends on the 5th of

12   January -- what did you mean by "after" the competition?

13                   MR. CHRETIEN:  Well, we would like to take

14   depositions, at least three depositions, starting with

15   Ms. Fialco and then Mr. Galle and then Mr. Straub.  We'd

16   like at least one day for Mr. Galle and Mr. Straub.  We

17   can do a half-day with Ms. Fialco.

18                   THE COURT:  Doesn't sound very unreasonable.

19                   All right.  So then -- but, you know, you

20   notice your discovery, and I think you all know my view on

21   discovery, or at least the people here in town do, and

22   that is the discovery is your problem and not my problem.

23   When it becomes my problem, it really is your problem.

24   And so I leave that entirely up to you.

25                   I think we should set two days in

Page 60

1    mid-January.  Ms. Leonard, what do we have?

2                   THE CLERK:  The 16th and the 17th.

3                   THE COURT:  Sixteenth and 17th.

4                   MR. ELLER:  Go ahead and tell him.

5                   MS. KAPLAN:  I am very sorry to say this.  I

6    am getting married on January 19th and will be out from

7    January 16th to --

8                   THE COURT:  Oh, best wishes --

9                   MS. KAPLAN:  -- the 20th.

10                   THE COURT:  -- that's fabulous.

11                   MS. KAPLAN:  I'm very sorry.

12                   MR. ELLER:  (Inaudible.)

13                   THE COURT:  Exactly.

14                   MS. KAPLAN:  And it's away so the entire

15   firm is going to be there with me.  I'm very sorry.

16                   THE COURT:  All right.  So you shouldn't be

17   sorry.  So let's not start a marriage with "I'm sorry."

18                   All right.  So can we go a little bit

19   earlier than that Ms. Leonard.

20                   MR. ROSSI:  Judge, can I comment, your

21   Honor.

22                   THE COURT:  Yes, yes.

23                   MR. ROSSI:  Gene Rossi.

24                   We mention January 5th, actually the whole

25   pageant goes through January 8th, so I humbly ask that we

1  go into the week of January 27th in light of Ms. Kaplan's

2  wonderful event.

3              THE COURT:  Okay.  Ms. Kaplan, when are you

4  back?

5              MS. KAPLAN:  I am back on the 20th or the --

6  yeah.

7              THE COURT:  All right.  How --

8              MS. KAPLAN:  I'm not going on a honeymoon, I

9  take too many other vacations.

10             THE COURT:  I find that unlikely, since I

11  think you've been here every week for the last how many

12 years?

13             All right.  So let's go back to the

14 scheduling.  And, Ms. Leonard, what can you give us in

15 that timeframe?

16             THE CLERK:  We could do the 23rd or 24th,

17 I'm just checking --

18             THE COURT:  Why, you think I have something?

19 No, it's -- no, it's gone.

20             All right.  We can do that.  That's a

21 Thursday and Friday?

22             THE CLERK:  Yes.

23             THE COURT:  Objections.

24             UNIDENTIFIED SPEAKER:  Objection, your

25 Honor.  What day?

Page 62

1           UNIDENTIFIED SPEAKER:  What day?

2           UNIDENTIFIED SPEAKER:  Thirtieth and 31st.

3           THE COURT:  No, 23rd and 24th.

4           UNIDENTIFIED SPEAKER:  Oh.

5           UNIDENTIFIED SPEAKER:  Is that all right?

6           UNIDENTIFIED SPEAKER:  Your Honor, could --

7           THE COURT:  Of January.

8           UNIDENTIFIED SPEAKER:  -- you do the --

9           THE COURT:  Of January.

10          UNIDENTIFIED SPEAKER:  Selfishly I've got to

11 go on a trip the week of the 20th, but I would prefer the

12 week of the 27th, your Honor, please.

13          THE COURT:  Do I hear any -- we're getting

14 later and later.

15          All right.  I'm going to tell you, there's

16 couple of things I'm concerned about here, because now

17 we're couple months in, but we'll come back to that.

18          Can you go to the next week, Ms. Leonard?

19          THE CLERK:  (Inaudible.)

20          UNIDENTIFIED SPEAKER:  Thank you, Judge.

21          THE COURT:  We don't have consecutive days

22 that week?

23          THE CLERK:  There's one thing on the 29th --

24 (inaudible.)

25          THE COURT:  Yeah, let's -- any two days, the

Page 63

1    28th to the 31st, what do you prefer?

2                   UNIDENTIFIED SPEAKER:  Twenty-nine and 30,

3    your Honor.

4                   THE COURT:  That's fine with me.

5                   Tom, we'll just move the calendar to

6    Tuesday.  There's probably not anything there yet anyway.

7                   All right.  Any concerns with that?  That's

8    Wednesday and Thursday, the 28th and 29th.  Yes?

9                   UNIDENTIFIED SPEAKER:  No, that's --

10                  THE COURT:  No, 29th and 30th, excuse me.

11                  UNIDENTIFIED SPEAKER:  Of January, that's

12   good, your Honor.

13                  THE COURT:  Okay.

14                  UNIDENTIFIED SPEAKER:  That's good.

15                  THE COURT:  All right.  Now, I -- forgive me

16   for asking this question, are some of you not bankruptcy

17   people?

18                  UNIDENTIFIED SPEAKER:  Your Honor, I did six

19   years of bankruptcy with the U.S. Department of Justice.

20                  THE COURT:  Good.

21                  All right.  I just want to make it clear.  I

22   expect all the discovery to be done, and I expect it to be

23   done a week ahead of that hearing.  I do not want to be

24   involved in discovery disputes.  There should not be that

25   many depositions in this.  I don't think you should be

1    arguing about how much time people are deposed.  You need

2    to get the relevant information.  I'm not going to be

3    ordering -- I don't think I should need to order short

4    notices.  You should get together and negotiate who is

5    being deposed and schedule it without my involvement.

6               If I need to be involved, then the party

7    that's not agreeing, that will be telling me a lot about

8    what's happening in this case.  I just want everybody to

9    know that ahead of time.  This needs to move quickly.  In

10   my experience the time between now and that hearing is

11   longer than any matter I've had in a motion to dismiss a

12   Chapter 11 case.  So we're waiting, in my view, a very

13   long time to get to a hearing on this.

14               There are two things that I've heard today

15   that I think are very important.  One is the

16   representation from Ms. Flemming's counsel that the

17   organization operating the event is not the debtor and

18   that the debtor's involvement, and the debtor being Miss

19   America Competition, LLC, is not, except with one limited

20   regard, necessary to putting on the event to be held

21   between December and January upcoming.  And the only

22   exception that I heard about is that there may be some

23   personal property that would otherwise be transported to

24   Orlando to be used in connection with the event, and that

25   personal property is owned by Miss America Competition

Page 65

1   LLC.  I would find it very suspicious if that personal

2   property was not made available to allow the event to go

3   forward.  I just want to make that clear.  Okay?

4               And next, the other concern that I have is

5   the appropriate concern raised by counsel for the debtor

6   that without cooperation from Ms. Flemming, they'll be

7   unable to comply with the requirements of the United

8   States trustee.  That is not the way to obtain dismissal

9   of this case.  And I expect that Ms. Flemming will

10  cooperate as necessary.  I'm not saying give up the farm,

11  but I am saying make sure that counsel for Miss America

12  Competition, LLC, who has appeared today, is in a position

13  to do the things that necessary for a

14  debtor-in-possession, including provide necessary

15  information to Mr. Schank.

16              Mr. Schank, are you on this case, or are you

17  just appearing today?

18              MR. SCHANK:  I am just appearing today, your

19  Honor.

20              THE COURT:  Oh, Ms. Feinman is on this case.

21              MR. SCHANK:  She will be, yes.

22              THE COURT:  All right.  So to make sure that

23  Ms. Feinman gets what the United States trustee's office

24  requires, and I prefer not to be hearing about that

25  either.

Page 66

1                  Again, all of your actions moving forward

2      will be signals to me about what's happening behind the

3      scenes in this case.  And I suggest to you that you don't

4      want me to be receiving those signals ahead of the

5      evidentiary hearing.

6                  Are there any questions?  I'm going to get

7      to deadlines in a moment and the reply.

8                  (No audible response.)

9                  THE COURT:  All right.  Do you need --

10                 UNIDENTIFIED SPEAKER:  (Inaudible.)

11                 THE COURT:  Is that somebody that needs to

12     be heard?

13                 UNIDENTIFIED SPEAKER:  No, I was going to

14     say no questions.

15                 THE COURT:  Okay.  Do we need a scheduling

16     order of any kind?

17                 Now those of you who practice here in

18     Southern District of Florida regularly know that we have

19     scheduling order that all of us use in adversary

20     proceedings.  I have something of similar complexity for

21     contested matters.  I can use that if you think it's

22     useful to you.  If not, I can simply have a discovery

23     deadline and set the evidentiary hearing.

24                 Do you have views on this?

25                 UNIDENTIFIED SPEAKER:  Discovery deadline.

1           MR. GAY:  Your Honor, again for the record

2   David Gay.  I actually looked at Mr. Eller because I think

3   maybe the suggestion would be for us to confer on that and

4   see if we think it would be helpful.  If your Honor would

5   be willing to set just the discovery deadline today --

6           THE COURT:  Absolutely.

7           MR. GAY:  -- and then we can come back with

8   a more fulsome scheduling order if we think that would

9   facilitate the proceedings.

10           THE COURT:  Okay.  You may get the form from

11   Ms. Leonard in Word if you like, and if you wish to have

12   that, I'm glad to use it.

13           MR. ELLER:  I think it's helpful, Judge, in

14   our experience, having the Court send that direction keeps

15   things moving along.  We prefer to have it.

16           THE COURT:  All right.  Well, I hear you

17   loud and clear, and so you can get that from Ms. Leonard.

18           Now, in terms of a reply, either Mr. Rossi

19   or Mr. Chretien, I don't remember, suggested that there's

20   reply to be filed.

21           UNIDENTIFIED SPEAKER:  Yes, your Honor.

22           THE COURT:  I'm glad to accept that.

23           Do you wish, Mr. Eller, to do anything else?

24           I mean we have very -- briefing would be --

25   I would say a fairly grand description of what I've

1   received so far.

2                   And so what I'm suggesting is maybe what we

3   do is allow each of you to file something ahead of the

4   evidentiary hearing.  It doesn't have to be tomorrow,

5   Mr. Rossi.  God forbid.  Tomorrow is Thanksgiving.

6                   UNIDENTIFIED SPEAKER:  Your Honor, I --

7                   THE COURT:  It doesn't have to be this week,

8   all right, and I think it's best to have the movant go

9   first, and then have Mr. Eller be in a position to

10  respond.

11                  UNIDENTIFIED SPEAKER:  (Inaudible.)

12                  THE COURT:  Okay.

13                  UNIDENTIFIED SPEAKER:  That's fine.

14                  THE COURT:  And that way you can address the

15  factual issues that you think I should review ahead of

16  time and legal issues if there are any, and the same from

17  the point of view from Miss America Competition.  And I

18  think it would be wise to do that.  Twenty pages max.  We

19  will do two weeks ahead of the evidentiary hearing and

20  then a week ahead of the evidentiary hearing, unless you

21  prefer other dates.

22                  MR. ELLER:  That sound appropriate, your

23  Honor.

24                  THE COURT:  Okay.  So I'll include that in

25  the order.

1             Yes, Mr. Gay.

2             MR. GAY:  So I just -- your Honor, to

3    clarify, my recollection is that the scheduling order will

4    include a deadline for disclosing witnesses and exhibits

5    and things of that nature as well?

6             THE COURT:  Well, that's in the larger

7    scheduling, correct.

8             MR. GAY:  Right.

9             THE COURT:  So it has -- it's quite

10   complicated.  We've adopted it from the district court, so

11   it has, you know, Rule 26 disclosures, it has expert

12   witness issues, and it also has the documents that you

13   referred to, witness lists and the like.  The only thing

14   not directly referenced in it would be the exchange of

15   exhibits and objections, which is in the local rule.

16            MR. GAY:  And the only reason I ask, your

17   Honor, is timing vis-a-vis the submission of the briefs,

18   just --

19            THE COURT:  Suggest something else, and I'll

20   put a different date in.

21            MR. GAY:  I just -- I think we'll be able to

22   confer and --

23            THE COURT:  So you prefer I leave that out

24   at this stage.  There's not a briefing provision in the

25   scheduling order.

Page 70

1              MR. GAY:  No, I think -- your Honor, sorry,
2     continue with the briefing scheduling your Honor had
3     indicated --
4              THE COURT:  Okay.
5              MR. GAY:  -- and we'll address the dates if
6     we think that's problematic in respect of the briefing
7     scheduling for any reason.
8              THE COURT:  Okay.  Great I will do a very --
9              UNIDENTIFIED SPEAKER:  Just to confirm, your
10    Honor --
11             THE COURT:  Yes.
12             UNIDENTIFIED SPEAKER:  -- just to confirm is
13    two weeks before the hearing date our brief is due and
14    then one week later their brief is due?
15             THE COURT:  Correct.
16             UNIDENTIFIED SPEAKER:  Thank you, your
17    Honor.
18             THE COURT:  And I'll put page limits in.
19    You know, for me the focus on the factual issues that you
20    think are important and the -- if you have law that you
21    wish to address.  I'm going to read everything that you
22    submit, and I'll also look at the case law no matter how
23    you describe it, and I always do my own research anyway.
24    But so I encourage you to be succinct, because it is
25    helpful to me, but I think two weeks ahead and one week

1   ahead would be useful to me because that's when I'm really

2   focusing on it mentally anyway.

3                  All right.  Anything else today?

4                  UNIDENTIFIED SPEAKER:  I don't think so.

5                  THE COURT:  No.

6                  MR. GAY:  I don't think, thank you very much

7   for your time.

8                  THE COURT:  Of course.  Happy Thanksgiving

9   everyone.

10                  (In Unison:  Happy Thanksgiving, your Honor.

11                  THE COURT:  Thank you, everyone.

12                  Court is adjourned.

13                  (The hearing was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 72

1

2

3                          CERTIFICATION

4

5    STATE OF FLORIDA        :

6    COUNTY OF BREVARD        :

7

8              I, Anna M. Meagher, Shorthand Reporter and

9    Notary Public in and for the State of Florida at Large, do

10   hereby certify that the foregoing proceedings were

11   transcribed by me from a digital recording held on the

12   date and from the place as stated in the caption hereto on

13   Page 1 to the best of my ability.

14             WITNESS my hand this 14th day of

15   December, 2024.

16

17             _____

18             ANNA M. MEAGHER, Shorthand Reporter
               and Notary Public in and for the
19             State of Florida at Large
               Commission #HH59960
20             January 9, 2025

21

22

23

24

25